IN THE DISTRICT COURT OF LINCOLN COUNTY
STATE OF OKLAHOMA

FILED
DEC 29 2022
CINDY KIRBY, COURT CLERK
LINCOLN COUNTY, OKLAHOMA

C. DAVID RHOADES, as the Court-Appointed )
Receiver for RHA Stroud, Inc. and         )
RHA Anadarko, Inc.,                       )
                                          )
                    Plaintiff,            )
                                          )
v.                                        )   Case No. CJ-2022-182
                                          )
ONE CURA HEALTH (f/k/a ONE CURA           )
WELLNESS); CHARLES M. ELDRIDGE;           )   Judge: _____
MARTIN L. MONACO; and AKERMAN LLP,        )
                                          )
                    Defendants.           )

## PETITION

Plaintiff, C. David Rhoades, in his capacity as the Court-appointed receiver for RHA Stroud, Inc. and RHA Anadarko, Inc. ("Plaintiff" or "Receiver"), brings this action against Defendants One Cura Health, formerly known as One Cura Wellness ("One Cura") and Charles M. Eldridge; and against Akerman LLP and Martin L. Monaco (collectively "Akerman Defendants," and together with One Cura and Eldridge, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1.   RHA Stroud, Inc. ("RHA Stroud") and RHA Anadarko, Inc. ("RHA Anadarko," and together with RHA Stroud, the "Hospitals") are Oklahoma nonprofit corporations that own two rural Critical Access Hospitals that have been serving Oklahoma communities since 1978. The Plaintiff is the Receiver for the Hospitals and, as such, is empowered to bring this lawsuit to recover money wrongfully taken from the Hospitals prior to his appointment as Receiver.

2.   Between 2011 and 2020, RHA Stroud and RHA Anadarko were owned by One Cura, a one-person California corporation formed by Charles Eldridge. When One Cura acquired the Hospitals in 2011, the acquisition was financed with debt owed to the previous owner, Rural Hospital Acquisition, LLC ("RH Acquisition"). The Hospitals gave RH Acquisition promissory notes for millions of dollars and secured the notes with a blanket lien on all assets of the Hospitals.

**EXHIBIT 1**

3.   Although One Cura owned the Hospitals, its role was very limited. The Hospitals were operated and managed by a group of companies affiliated with RH Acquisition under a series of contracts and leases. The Hospitals also leased the buildings where the Hospitals operated from an affiliate of RH Acquisition.

4.   The Hospitals regularly operated at a significant loss and failed to pay RH Acquisition and its affiliated companies millions of dollars that the Hospitals owed for rent, management fees, and interest on the promissory notes.

5.   As described below, Eldridge and One Cura breached their fiduciary duties by diverting millions of dollars from the heavily indebted Hospitals for their own benefit. Eldridge and One Cura were aided in this scheme by attorney Martin L. Monaco and the law firm of which he was a partner, Akerman.

6.   Monaco and Akerman agreed to serve as attorneys for the Hospitals, and were therefore fiduciaries that owed duties of loyalty and care to the Hospitals. Rather than serve the interests of the Hospitals, however, Monaco and Akerman schemed with Eldridge and One Cura to take as much of the Hospitals' cash as possible for themselves.

7.   While this scheme had a limited shelf-life because RH Acquisition and its affiliates had the right to take control of the Hospitals away from Eldridge and One Cura, the Defendants concealed their activities to prolong their access to the Hospitals' money. Eventually, RH Acquisition and its affiliates sued to eject Eldridge and One Cura and obtain appointment of a receiver for the Hospitals, but Eldridge and One Cura, together with Monaco and Akerman, used the Hospitals' cash in an ill-advised and ill-fated attempt to maintain control of the Hospitals' cash for themselves.

8.   These efforts culminated in the Defendants' filing of bankruptcy petitions for the Hospitals, which endangered the Hospitals, for the sole purpose of benefiting the Defendants. The U.S. Bankruptcy Court dismissed the bankruptcy petitions, expressly finding that the Defendants had filed the bankruptcy cases in a bad faith effort undertaken for the purpose of ensuring One Cura and Akerman's continued ability to take large amounts of money from the Hospitals.

2

9. The Receiver brings this lawsuit to recover from the Defendants the money they wrongfully took from the Hospitals in breach of their respective duties.

**PARTIES**

10. Plaintiff C. David Rhoades is the Court-appointed Receiver of RHA Stroud, Inc. formerly doing business as Stroud Regional Medical Center, located in Lincoln County, Oklahoma, and RHA Anadarko, Inc., formerly doing business as The Physicians Hospital in Anadarko, located in Caddo County, Oklahoma. Receiver was appointed by Court Orders entered on December 31, 2020, in the case of *Rural Hospital Acquisition, LLC, et al. v. RHA Stroud, Inc., et al.*, Case No CJ-2020-31, District Court of Lincoln County, State of Oklahoma (the "Receivership Orders").

11. Defendant One Cura Health, formerly known as One Cura Wellness ("One Cura"), is a California nonprofit corporation with its principal place of business at 8502 E. Chapman Avenue, Suite 431, Orange, California 92869.

12. Defendant Charles M. Eldridge is an individual residing in Orange County, California. At all relevant times, Eldridge was the chairman and CEO of One Cura. One Cura was the sole and controlling member of the Hospitals. Eldridge was president and served on the board of directors of both of the Hospitals. The boards of directors of both Hospitals also included three other individuals who constituted a majority of the boards' membership. On information and belief, these other directors were not disinterested in that they were also directors of One Cura, but these other directors were unaware that Defendants were acting wrongfully against the Hospitals, and Defendants concealed same from them.

13. Defendant Akerman LLP is a limited liability partnership, organized under the laws of the State of Florida, with its principal address located in Miami-Dade County, Florida.

14. Defendant Martin L. Monaco is an individual residing in Union County, New Jersey, and is a partner at Akerman LLP, based in the firm's New York office.

## JURISDICTION AND VENUE

15. As set forth in this Petition, this case arises out of the significant and purposeful contacts that each of the Defendants has had within the State of Oklahoma and with the Hospitals and other persons and entities within the State of Oklahoma. The court therefore has personal jurisdiction over all Defendants pursuant to 12 O.S. § 2004(F).

16. Receiver brings this action pursuant to the powers set forth in the Receivership Orders. Pursuant to the Receivership Orders, Receiver has all powers as provided for in 12 O.S. § 1151 et seq. including, without limitation, the power to initiate and prosecute any and all actions on behalf of the Hospitals to protect, maintain, and preserve the receivership estate.

17. This court therefore has jurisdiction over the parties and the subject matter of this action, and venue is proper, as this Petition is brought to accomplish the objectives of the Receivership Orders and is thus ancillary to the Court's jurisdiction over the receivership estates.

## FACTUAL ALLEGATIONS

### A.     The Hospitals

18. RHA Stroud and RHA Anadarko are critical access hospitals that provide healthcare services and facilities to their respective rural communities in Lincoln County and Caddo County, Oklahoma. They are the largest nonprofit healthcare systems in Lincoln and Caddo Counties. Each Hospital has 25 licensed beds. Each was established in 1978.

19. The Hospitals are exempt nonprofits under Section 501(c)(3) of the Internal Revenue Code.

20. Since their inceptions, the Hospitals have grown exponentially, and in the past decade, they have provided dependable and critical healthcare to their respective communities. They each are about 20 miles away from the closest other medical facility and as such, they are a lifeline for many of the patients who live within the Hospitals' service area.

21. Both Hospitals have active emergency rooms that are open 24 hours per day, 7 days per week, and are staffed with qualified, credentialed emergency healthcare providers and certified emergency nurses. They both have in-patient medical services, and Anadarko offers

4

outpatient surgery, while Stroud has applied for a license to also offer outpatient surgeries. Each offers a robust wound care program with specially trained surgeons and board-certified wound-care nurses. The Hospitals provide internal medicine physicians, infectious disease physicians, acute care nurse practitioners, and pharmacists. They also provide a swing bed program that allows a patient to transition from acute care to skilled nursing facility care, such as physical therapy or occupational therapy, without leaving the hospital.

22. The Hospitals also provide important non-medical services to the communities they serve. For example, they have been providing joint programs that work with local technical colleges and local community colleges to help Oklahoma residents with GED preparation. They have also worked with the Wichita and affiliated tribes on a suicide prevention program. They have provided dinner-and-learn series, through which important information about illnesses common in their area, like diabetes are discussed. They also have participated in Meals on Wheels and various different community health fairs in their respective counties.

**B.     One Cura Had a Limited Role for Limited Compensation**

23. Prior to April 1, 2011, the Hospitals were owned by RH Acquisition. On that date, RH Acquisition sold the Hospitals to Charles Eldridge via a Stock Purchase Agreement through which Eldridge purchased all membership interests in the Hospitals. Eldridge then contributed those membership interests to a new entity he formed – One Cura. Eldridge was the only employee of One Cura and was its Chairman and CEO.

24. Eldridge and One Cura did not pay cash to acquire the Hospitals. Rather, they financed the acquisition with debt. Eldridge paid for the acquisition by having each of the Hospitals issue a promissory note to RH Acquisition (the "Notes"). The original principal amounts of the Notes were $5,250,000 owed by RHA Anadarko and $6,750,000 owed by RHA Stroud. The Notes called for quarterly interest payments, with all outstanding principal to be paid in full by March 31, 2021. When the Notes were amended and restated in 2015 to include amounts that were due and unpaid, RHA Anadarko owed $5,928,028.05 and RHA Stroud owed $8,097,684.06. The new Notes were similarly secured by a lien on substantially all assets of the

5

Hospitals, including their personal property, permits, licenses, accounts receivable, and bank accounts.

25. The Hospitals rented the land and facilities from an affiliate of RH Acquisition named Physicians Realty Group, LLC ("FP Realty"). The combined rent for both Hospitals was approximately $110,000 per month.

26. At the time Eldridge purchased the Hospitals, the Hospitals entered into multiple service contracts with various affiliates of RH Acquisition, including:

    a. Management Services Agreements ("MSAs") under which management and support services were provided to the Hospitals by First Physicians Business Solutions, Inc. ("FP Business");

    b. Staff Leasing Agreements under which the Hospitals leased clinical, administrative, and other personnel, physicians, and senior executives from First Physicians Resources, LLC ("FP Resources"); and

    c. Ancillary Services Agreements under which First Physicians Services, LLC ("FP Services") provided the Hospitals with information technology, diagnostic testing services, electronic health records, software and systems, management of professional services, and other ancillary services.

27. Under the MSAs, FP Business had the sole and exclusive right and obligation to furnish or perform or arrange for the furnishing or performance of the management services "in whatever manner" FP Business "reasonably determines is appropriate under the circumstances," and the Hospitals agreed that they would "not interfere with or prevent . . . [FP Business] from carrying out its responsibilities under the [MSAs]."

28. As a result of the Service Contracts: (a) the companies affiliated with RH Acquisition (collectively, "FP Group") handled all day-to-day operations and transactions for the Hospitals; (b) FP Group prepared the Hospitals' financial statements and provided them to Eldridge monthly; (c) the Hospitals had no employees as all physicians, medical staff, and other employees were retained by FP Group; (d) revenues generated by the Hospitals were swept daily

by FP Group and used to pay third-party vendors and (a portion of) its fees under the Service Contracts; (e) FP Group submitted to Eldridge weekly cash disbursements by vendor, the cost report and supporting financial documentation, and a daily status on the Hospitals; and (f) FP Group maintained possession of the Hospitals' books and records.

29.  Eldridge's limited role was to provide oversight of the Hospitals and help develop their policies, to review and sign cost reports submitted to Medicare, to work with community outreach, to attempt (unsuccessfully) to fund-raise and obtain grants, to deal with the outside provider of a surgical department at RHA Anadarko, to attend a variety of meetings, and to work with consultants and the Hospitals' advisory boards. Eldridge, who lives in Orange County, California, would visit the Hospitals approximately 3-4 times per year, although the number of visits diminished over time.

30.  For Eldridge's limited role, each of the Hospitals paid a "director's fee" to One Cura. In early 2018, that fee was $12,500 per month per Hospital, for a total of $300,000 per year. This was the sole source of One Cura's revenue. From this revenue, One Cura paid Eldridge a salary of $225,000 per year. Eldridge did not receive a salary directly from the Hospitals.

31.  During the relevant period, the Hospitals were insolvent (under the cash flow test) in that they did not earn enough revenue to pay the amounts owed to their vendors, including to FP Group for its services and for rent on the Hospitals, and to pay interest on the Notes. Indeed, the Hospitals never paid any of the rent on the Hospitals because they did not have enough money to pay the rent. The Hospitals never paid any principal and only a small amount of interest on the Notes, again due to insufficient available funds.

32.  The Hospitals survived because the FP Group prioritized payments to third-party vendors and to One Cura's director's fees, causing the Hospitals to fall further and further behind in paying the FP Group. As of September 30, 2018, the Hospitals collectively owed FP Group more than $15 million on the Notes and more than $18 million for rent and fees.

### C.  Monaco and Akerman Were Retained as Attorneys for the Hospitals

33. Starting in approximately 2016 through late 2020, Eldridge caused the Hospitals to retain the legal services of Akerman and its attorneys, including Monaco. Akerman and Monaco represented the Hospitals on various matters, and also represented One Cura, both jointly with the Hospitals and on separate matters.

34. As the law firm for the Hospitals, Akerman and its constituent attorneys owed a fiduciary duty of loyalty to the Hospitals and were therefore, prohibited from taking any actions that would favor the interests of the law firm or of One Cura over the interests of the Hospitals.

35. Akerman failed to make any written disclosure to the Hospitals regarding the conflicts of interest Akerman had by virtue of representing both the Hospitals and One Cura, and the Hospitals were not asked to and did not execute any written waivers of Akerman's conflicts of interest.

### D.  Defendants Loot the Hospitals

36. Because the Hospitals were unable to meet their ongoing obligations to pay rent and other amounts due to FP Group, and had no ability to pay the impending balloon payments that were set to come due under the Notes in early 2021, Defendants started looking for ways to benefit themselves in the short-term at the expense of the Hospitals.

37. In breach of their fiduciary duties to the Hospitals, Defendants misappropriated millions of dollars from the Hospitals that was received by One Cura and Akerman.

#### 1.  Akerman Charged the Hospitals for Services Rendered to One Cura

38. One way in which Defendants misappropriated money was to have the Hospitals pay for legal services that Akerman performed for One Cura and/or Eldridge that was not connected to legal work for the Hospitals. In all, Akerman charged the Hospitals at least $2.3 million for legal work performed for One Cura. Defendants all benefited from having the Hospitals pay for Akerman's work on behalf of One Cura, and they all jointly saddled the Hospitals with this burden.

39. Defendants worked together to fool the Hospitals into paying One Cura's legal fees. Starting in 2016, Eldridge would send non-detailed, summary Akerman invoices to FP Group for payment using the Hospitals' funds. FP Group would in turn add Akerman's invoices to its list of all other Hospital expenses and send the same to Eldridge to review and to authorize payment. Eldridge approved the Akerman invoices for payment by the Hospitals, while concealing from FP Group that Akerman's invoices included services that were not for the benefit of the Hospitals.

40. Eldridge directed FP Group to pay from the Hospitals' funds the entirety of Akerman's monthly invoices, including for matters related strictly to representing One Cura. For example, the Hospitals paid Akerman to attend One Cura's board of directors retreat; to advise One Cura on One Cura's general corporate matters and executive compensation; to advise One Cura concerning the potential acquisition of various hospitals that were separate from the Hospitals; to advise One Cura concerning lobbying policies and procedures; and to advise One Cura concerning a potential joint venture with Grady Memorial Hospital.

### 2. Akerman Helped One Cura to Use Sham Contracts to Radically Increase the Fees Paid by the Hospitals

41. Another way in which Defendants misappropriated the Hospitals' money was by causing One Cura, in 2018, to radically increase its director's fee from $12,500 per month per Hospital to $100,000 per month per Hospital. This eight-fold increase was a pure money-grab and there was no justification for it.

42. In its role as the payment agent for the Hospitals, the FP Group protested that the massive increase in fees to One Cura was a breach of the contracts that FP Group had with the Hospitals. FP Group agreed to pay for one month while reserving all rights.

43. Monaco then advised Eldridge how to conceal the money from the Hospitals (i.e., Monaco's own clients): "Make sure the new bank account is in a different bank and that you get a bank draft for $175k so that it is not traceable." A copy of Monaco's email is attached to this Petition as Exhibit A.

44. After FP Group continued to protest, Defendants reduced the excessive fees to $62,500 per month per Hospital, which was still a five-fold increase. In an attempt to justify the increased director's fees, the Defendants came up with the pretext that the fees were needed so that One Cura could hire additional personnel such as in-house counsel and accounting staff. No such staff was ever hired.

45. The increased fees for One Cura were memorialized by Defendants in sham contacts called "Management Agreements" between One Cura and each of the Hospitals. The sham contracts were signed by Eldridge on behalf of the Hospitals. On information and belief, the sham contracts were prepared by Monaco and Akerman.

46. One Cura performed no additional services for the extra money. Indeed, there was nothing more for One Cura to do for the Hospitals beyond the limited tasks that Eldridge had already been performing as the sole employee of One Cura.

47. As a result of the increased director's fees, the Hospitals paid One Cura more than $2 million in excess of the fair amount that it had previously charged.

### 3. Akerman Excessively Charged the Hospitals for Non-Legal Services

48. With Eldridge forcing Akerman's invoices to be paid in full without regard to the value of Akerman's services to the Hospitals, Akerman took the opportunity to charge the Hospitals in an excessive manner. For example, in 2018, Defendants started requiring FP Group to have every expense for the Hospitals approved by Monaco and Akerman, even though most expenses had nothing to do with Akerman and there was no need to have attorneys charge to review routine business expenses.

49. All told, the Hospitals paid excessive bills to Akerman totaling more than $4.1 million over a period of just over three years.

### 4. Akerman Charged the Hospitals to Raise a "Litigation War Chest"

50. In addition to charging the Hospitals unreasonable and excessive amounts, at Monaco's suggestion, in or about October 2018, Akerman started adding a pad to its invoices to the Hospitals. Over the course of more than a year, Akerman's phantom charges to the Hospitals

totaled hundreds of thousands of dollars. The purpose of the padded invoices was, as Monaco described in an email, "to build a litigation war chest." A copy of this email is attached to this Petition as Exhibit B.

51.     Because Akerman had Eldridge submit non-detailed, summary invoices to FP Group for payment by the Hospitals, FP Group caused the Hospitals to pay Akerman's padded invoices without realizing that the invoices included non-current, phantom charges to create a "war chest."

52.     The "war chest" was created by Akerman and One Cura in anticipation that Eldridge would have Akerman try to stymie FP Group's efforts to collect the millions of dollars it was owed by the Hospitals. There was no benefit to the Hospitals in doing so. FP Group was indisputably owed many millions of dollars and had a lien on substantially all assets of the Hospitals. In addition, FP Group could evict the Hospitals for nonpayment of rent at any time and had been forbearing from doing so. In short, a war with FP Group was not in the Hospitals' best interests and was undertaken solely to preserve Defendants' ability to continue draining cash from the Hospitals.

53.     Indeed, Defendants squandered the "war chest" by unsuccessfully fighting against FP Group's efforts to preserve and safeguard the Hospitals with the appointment of a receiver. The fight, funded by the Hospital's war chest, provided no benefit whatsoever to the Hospitals and was done solely to benefit Defendants.

54.     When the District Court of Lincoln County granted the motion for appointment of a receiver, Defendants responded by putting the Hospitals into bankruptcy in order to delay the receiver from taking over the Hospitals. On December 30, 2020, the U.S. Bankruptcy Court for the Western District of Oklahoma ordered that the bankruptcy cases be dismissed, expressly finding that the bankruptcy cases had been filed in bad faith in order to prioritize payment to One Cura and its professionals, including most notably, Akerman.

55.     The filing of the bankruptcy cases had the effect of staying the appointment of the receiver. When the bankruptcy cases were dismissed, the stay was lifted, and on December

31, 2020, the District Court entered its order appointing Mr. Rhoades as Receiver of the Hospitals. Receiver's investigations into the circumstances of the Defendants' operation of the Hospitals resulted in the commencement of the instant action to recover funds that were looted by the Defendants.

56. Defendants exercised adverse domination and control over the Hospitals until the Receiver took over the Hospitals on December 31, 2020. Prior to the receivership, the adverse domination and control by Defendants, along with their concealment of their wrongdoing from the directors of One Cura and the Hospitals other than Eldridge, prevented the Hospitals from instituting this lawsuit. Thus, the statute of limitations was tolled and did not commence to run until December 31, 2020.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Defendants One Cura and Eldridge)

57. Receiver incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

58. At all times relevant to this Petition, Eldridge controlled and/or held positions as officers and/or directors of the Hospitals and simultaneously held positions as an officer and director of One Cura, the Hospitals' sole member.

59. By virtue of One Cura and Eldridge's positions as controlling persons, officers, and directors of the Hospitals, a fiduciary relationship existed between each of them and the Hospitals. Accordingly, Eldridge and One Cura owed fiduciary duties of loyalty, good faith, and due care to the Hospitals and were required to use their utmost ability to control and manage the Hospitals in a fair, just, honest, and equitable manner. Eldridge and One Cura were required to act in furtherance of the best interests of the Hospitals at all times.

60. Eldridge and One Cura, because of their positions of control and authority over the Hospitals, exercised control over the wrongful acts complained of herein.

61. Eldridge and One Cura breached their duty of loyalty and duty of care by causing the Hospitals to pay One Cura and Akerman excessive amounts that were intended to benefit Defendants rather than the Hospitals.

62. As a direct and proximate result of Eldridge and One Cura's above-referenced breaches of fiduciary duties, the Hospitals incurred significant injury, including, without limitation, millions of dollars in excess director's fees paid to One Cura, as well as millions of dollars paid to Akerman, and potentially others, for the benefit of One Cura, Eldridge, and others, rather than for the benefit of the Hospitals.

63. Eldridge and One Cura's conduct, as alleged above, was willful, wanton, grossly negligent, and/or displayed a reckless disregard for the rights of the Hospitals. Plaintiff is therefore entitled to an award of punitive damages against Eldridge and One Cura.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duties

### (Against Akerman and Monaco)

64. Receiver incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

65. The Akerman Defendants are jointly liable for the breaches by One Cura and Eldridge of their fiduciary duties because the Akerman Defendants substantially and knowingly participated in, induced, encouraged, substantially assisted, and/or otherwise aided and abetted such breaches.

66. As a direct and proximate result of the Akerman Defendants' conduct, the Hospitals incurred significant injury, including, without limitation, millions of dollars in excess director's fees paid to One Cura, as well as millions of dollars paid to Akerman, and potentially others, for the benefit of One Cura, Eldridge, and others, rather than for the benefit of the Hospitals.

67. The Akerman Defendants' conduct, as alleged above, was willful, wanton, grossly negligent, and/or displayed a reckless disregard for the rights of the Hospitals. Plaintiff is therefore entitled to an award of punitive damages against each of the Akerman Defendants.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duties

### (Against Akerman and Monaco)

68. Receiver incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

69. By virtue of the Akerman Defendants' position as attorneys for the Hospitals, a fiduciary relationship existed between each of the Akerman Defendants and the Hospitals.

70. As fiduciaries, the Akerman Defendants had a fiduciary duty of loyalty to act in a manner consistent with the Hospitals' interests, and with the highest degree of good faith. The duties of loyalty and good faith require a lawyer to avoid conflicts of interests and to otherwise put the interests of the client above their own interests and those of others.

71. The Akerman Defendants breached their duty of loyalty to the Hospitals by overcharging the Hospitals and otherwise acting in a duplicitous way to obtain money from the Hospitals for Akerman and for One Cura.

72. The Akerman Defendants also owed the Hospitals a fiduciary duty of care to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise under similar circumstances.

73. The Akerman Defendants breached their duty of care to the Hospitals by giving advice and performing legal services that were beneath the standard of care owed to the Hospitals.

74. As a direct and proximate result of the Akerman Defendants' above-referenced breaches of fiduciary duties, the Hospitals incurred significant injury, including, without limitation, millions of dollars in excess director's fees paid to One Cura, as well as millions of

dollars paid to Akerman, and potentially others, for the benefit of One Cura, Eldridge, and others, rather than for the benefit of the Hospitals.

75. The Akerman Defendants' conduct, as alleged above, was willful, wanton, grossly negligent, and/or displayed a reckless disregard for the rights of the Hospitals. Plaintiff is therefore entitled to an award of punitive damages against each of the Akerman Defendants.

## FOURTH CAUSE OF ACTION

### Professional Negligence/Legal Malpractice

### (Against Akerman and Monaco)

76. Receiver incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

77. By virtue of the Akerman Defendants' position as attorneys for the Hospitals, the Akerman Defendants owed the Hospitals a duty to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise under similar circumstances.

78. The Akerman Defendants breached their duty to the Hospitals and committed professional negligence by giving advice and performing legal services that were beneath the standard of care owed to the Hospitals.

79. As a direct and proximate result of the Akerman Defendants' professional negligence, the Hospitals incurred significant injury, including, without limitation, millions of dollars in excess director's fees paid to One Cura, as well as millions of dollars paid to Akerman, and potentially others, for the benefit of One Cura, Eldridge, and others, rather than for the benefit of the Hospitals.

80. The Akerman Defendants' conduct, as alleged above, was willful, wanton, grossly negligent, and/or displayed a reckless disregard for the rights of the Hospitals. Plaintiff is therefore entitled to an award of punitive damages against each of the Akerman Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Receiver prays for judgment against Defendants and each of them individually as follows:

1. For all applicable damages to the Hospitals proximately caused by Defendants' wrongful conduct, including compensatory and punitive damages in amounts to be determined at trial;

2. For pre-judgment and post-judgment interest;

3. For attorneys' fees and costs; and

4. For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Receiver demands a jury trial.

Respectfully submitted,

*/s/ Andrew C. Jayne*

Andrew C. Jayne, OBA #19493
BAUM GLASS JAYNE CARWILE & PETERS, PLLC
401 S. Boston Ave., Suite 2000
Tulsa, OK 74103
Telephone: (918) 938-7944
Facsimile: (918) 938-7966
ajayne@bgjclaw.com

-and-

Alan A. Greenberg
Michael H. Strub Jr.
Amir A. Shakoorian
(Pro Hac Vice Applications to be Filed)
GREENBERG GROSS LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 334-7000
Facsimile: (213) 334-7001
AGreenberg@GGTrialLaw.com
MStrub@GGTrialLaw.com
AShakoorian@GGTrialLaw.com

ATTORNEYS FOR PLAINTIFF/RECEIVER